UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| **OAK KNOLL ASSOCIATES, L.P.**, | ) ) | Case No. 13-20205 |
| Debtor. | ) ) |  |

# MEMORANDUM OF DECISION[1]

Before me are Robert Harris's motion seeking the allowance of his administrative expense claim (Docket Entry ("DE") 125) and Rosa Scarcelli's motion for summary judgment (DE 289). Debtor Oak Knoll Associates, L.P. joined in Scarcelli's motion (DE 299).

The essence of the dispute between Harris and Scarcelli is whether Harris is entitled to a commission for the work he performed in connection with the sale of the real estate owned by Oak Knoll in Connecticut. Harris and Scarcelli submitted numerous pleadings and exhibits, including a joint stipulation of facts (DE 288), Scarcelli's statement of material facts (DE 289-1), Harris's response to Scarcelli's statement of material facts and his own statement of material facts not in dispute (DE 301-1), and Scarcelli's response to that statement (DE 305-1). They also presented oral argument. Based on certain undisputed facts, the pleadings and arguments, I deny Harris's application and grant summary judgment in favor of Scarcelli and Oak Knoll.

---

[1] This memorandum constitutes the findings of fact and conclusions of law required by Fed.R.Bankr.P. 7052.

1

**Jurisdiction and Venue**

This court has jurisdiction over these matters pursuant to 28 U.S.C. §§157 and 1334, and Local Rule 83.6(a) issued by the United States District Court for the District of Maine. These matters are core proceedings pursuant to 28 U.S.C. §157(b)(2)(B). Venue is proper pursuant to 28 U.S.C. §1408.

**Facts**

The following facts are undisputed by the parties.[2] In 1988, Oak Knoll borrowed money from the Connecticut Housing Finance Authority ("CHFA") to buy low-income apartment buildings in Norwalk, Connecticut (the "Property"). The loan was memorialized by a promissory note and Oak Knoll's obligations under the note were secured by a mortgage on the Property. As part of the transaction, Oak Knoll agreed to certain restrictive covenants concerning the Property and the loan, including rent restrictions and prohibitions on the pre-payment or assignment of the mortgage. During the relevant time periods of this dispute, Scarcelli and her mother, Pamela W. Gleichman, were general partners of Oak Knoll, with Gleichman serving as its managing partner.

At some point in 2009, Oak Knoll hired Harris in his capacity as real estate broker to market the Property for sale, and in May of 2011 Oak Knoll and Harris signed their third listing agreement (the "Listing Agreement[3]"). Among other things, the Listing Agreement provided:

---

[2] Harris admitted all of the factual assertions in Scarcelli's statement of material facts, except he denied ¶¶ 17 and 20 and qualified the factual assertions in ¶¶14, 15, 18, 23, and 26. Scarcelli admitted all of the facts asserted by Harris, except she denied ¶¶ 29, 36, 48, 52, and 56; objected to ¶¶ 11-14, 50, 51, and 58; and qualified the factual assertions in ¶¶34, 42, 44, and 59.

[3] The relevant parts of the Listing Agreement are as follows:

> *THIS AGREEMENT made . . . between OAK KNOLL ASSOCIATES LIMITED PARTNERSHIP. . . hereinafter OWNER . . . and Robert Harris . . . hereinafter called AGENT, as follows:*

2

> If Harris sold the Property for $7,000,000 or any other price agreed to by Oak Knoll, within six months of May 17, 2011, Oak Knoll would pay him a commission of 4.8% of the sale price;
>
> If negotiations continued after the six month term, Oak Knoll would automatically extend the Listing Agreement and its terms until those negotiations were completed; and
>
> If during the term of the Listing Agreement or within six months after its termination, Oak Knoll accepted an offer on the Property, Oak Knoll would pay Harris the sales commission.

Eventually, Harris's efforts produced a potential buyer. On October 11, 2011, Navarino Capital Management, LLC ("Navarino") and Oak Knoll signed a purchase and sale agreement for the Property (the "2011 P&S") and Navarino delivered an earnest money deposit to an escrow agent. The 2011 P&S allowed Navarino 45 days to inspect the Property and to terminate the agreement for "any reason or no reason" by delivering a notice of termination to Oak Knoll prior to the expiration of the inspection period. The parties subsequently agreed to extend the inspection period to February 24, 2012. Prior to that date, Navarino wrote to Oak Knoll seeking different terms for the sale and a further extension of the inspection period under the 2011 P&S. Oak Knoll never responded and the 2011 P&S was eventually terminated.

Meanwhile, disagreements between Scarcelli and Gleichman over the direction of Oak Knoll's business escalated into litigation. On March 16, 2012, Scarcelli sued Gleichman in the

---

*In order [to] protect AGENT should the . . . PROPERTY . . . is [sic] sold within six (6) months from the date hereof, to sell the property for $7,000,000.00 or any such price as the OWNER may subsequently agree upon, agree to pay AGENT the commission set forth below. All parties to this agreement also agree that all communications and agreements, whether written [or] oral, will be transmitted through AGENT.*

*OWNER agrees that if the property is sold during the term of this Agreement to a Purchaser, procured by Agent during the term of this Agreement as outlined above, OWNER will pay AGENT a commission per Schedule A attached. Should negotiations continue after the six (6) month period the OWNER agree[s] to automatically extend this agreement and its terms until such as the negotiations are completed.*

*The commission shall be due and payable by certified check in full upon the closing of title (or lease execution). If, during the term hereof, or within six (6) months from the termination of this Agreement, should there be an acceptance of an offer to purchase/lease from the PURCHASER, OWNER agrees to pay the AGENT a commission as per this AGREEMENT.*

3

United States District Court for the District of Maine, and on May 31, 2012 that court entered default judgment in favor of Scarcelli enjoining Gleichman from entering into any contract for the sale of the Property without Scarcelli's written consent.  The acrimony between Scarcelli and Gleichman persisted and on June 26, 2012, Scarcelli's attorney threatened Harris with contempt sanctions if he continued negotiations for the sale of the Property to Navarino without disclosure to Scarcelli.  On November 13, 2012, Harris delivered an invoice for his brokerage work to Gleichman, as Oak Knoll's representative, and the next day he recorded a real estate commission lien on the Property.  On March 18, 2013, Oak Knoll filed for bankruptcy protection under Chapter 11 of the United States Code[4] in this Court.  Prior to the filing of Oak Knoll's bankruptcy, Scarcelli never consented to the sale of the Property.

Shortly after the filing of this case, Oak Knoll filed an application to retain Harris as its broker to sell the Property but later withdrew it.   In the interim, Harris filed a proof of claim for his brokerage services, to which both Oak Knoll and Scarcelli objected.  After that, in August of 2013, Oak Knoll's attorney instructed Harris to get a contract from Navarino for $6,275,000 even though the Court had not approved Harris's employment as Oak Knoll's real estate broker.

In mid-October of 2013, Navarino and Oak Knoll executed a purchase and sale contract for the Property (the "2013 P&S") and on November 25, 2013, Oak Knoll filed a plan of reorganization premised upon the 2013 P&S.  CHFA objected to the plan and moved to dismiss the case or, alternatively, to transfer venue of the case to Connecticut. Ultimately, Oak Knoll resolved CHFA's objections to the sale of the Property and an amended plan was filed on March 31, 2014.  That plan was confirmed and a sale of the Property to Navarino closed on or about July 3, 2014.

---

[4] Unless otherwise noted, all citations to statutory sections are to the Bankruptcy Reform Act of 1978, as amended, (the "Code"), 11 U.S.C. §101 et seq.

**Legal Standards and Burden of Proof**

This dispute implicates both the claims process and summary judgment. A proof of claim properly filed under §501 constitutes prima facie evidence of the validity and amount of the claim and is treated as an allowed claim unless a party in interest objects. F.R.Bankr.P. 3001(f); §502(a). If the objecting party presents evidence to overcome the claimant's prima facie claim, the burden of proof shifts back to the claimant. William L. Norton, Jr., *Norton Bankruptcy Law & Practice* §48:20 (3rd ed. 2014).

Summary judgment is appropriate when there is no genuine issue as to any material fact so that the moving party is entitled to judgment as a matter of law. *See* F.R.Civ.P. 56(a); *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008). A fact is material if it has the potential of determining the outcome of the litigation. *Id.* The court reviews the pleadings and considers the facts in the light most favorable to the non-moving party.

In her motion for summary judgment, Scarcelli outlines the lack of evidence supporting Harris's claim, thus shifting the burden of proof onto Harris "to establish the existence of a fact issue which is both material, in that it might affect the outcome of the litigation and genuine, in that a reasonable jury could, on the basis of the proffered proof, return a verdict for the opponent. It is settled that the nonmovant may not rest upon mere allegations, but must adduce specific, provable facts demonstrating that there is a triable issue." *Brennan v. Hendrigan*, 888 F.2d 189, 191 (1st Cir. 1989) (citations and internal quotations omitted).

**Discussion**

a. Harris's Claim Under Connecticut Law.

Not surprisingly, Harris seeks to be paid for his efforts in connection with the sale of the Property. Such payment is permitted under a confirmed plan of reorganization only if Harris had

5

a valid claim as of the date the bankruptcy petition was filed. The burden is on Scarcelli, as the objecting party, to overcome the prima facie quality of Harris's claim. In the context of her summary judgment motion, Scarcelli must do so based on undisputed facts and relevant bankruptcy law.

It is a well settled principle that claims in bankruptcy "arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code. That principle requires bankruptcy courts to consult state law in determining the validity of most claims. Indeed, we have long recognized that the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law. Accordingly, when the Bankruptcy Code uses the word claim—which the Code itself defines as a right to payment, 11 U.S.C. §101(5)(A)—it is usually referring to a right to payment recognized under state law." *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, 549 U.S. 443, 450-51 (2007) (citations and internal quotations omitted). "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55 (U.S. 1979). Therefore I must first turn to Connecticut law to determine how a broker's claim arises.

In contract cases, the Supreme Court of Connecticut has repeatedly stated that:

". . . the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity and words do not become ambiguous simply because lawyers or laymen contend for different meanings."

6

*Barnard v. Barnard*, 570 A.2d 690, 696 (1990)(citations and internal quotations omitted).

As for real estate brokerage contract basics, the Supreme Court of Connecticut provides the following guidance:

> The right of a brokerage firm to recover a commission depends upon the terms of its employment contract with the seller. To be enforceable, this employment contract, often called a listing contract, must be in writing and must contain the information enumerated in General Statutes §20-325a (b). To recover its commission, the brokerage firm ordinarily must show that it has procured a customer who is ready, willing and able to buy on terms and conditions prescribed or agreed to by the seller. In the alternative, the broker may be entitled to recover if it has brought the buyer and the seller to an enforceable agreement. The listing contract may, however, make the broker's right to a commission dependent upon specific conditions, such as the consummation of the transaction and the full performance of the sales contract.

*Revere Real Estate, Inc. v. Cerato*, 438 A.2d 1202, 1204-05 (Ct. 1982) (citations, internal quotations and footnotes omitted).

b. The Listing Agreement

The relevant contract in this dispute is the Listing Agreement. In order for Harris to have a valid claim, he must have a right to a commission earned under its terms pursuant to Connecticut law. I conclude that the Listing Agreement unambiguously provides Harris with three possible paths to a commission for the sale of the Property from Oak Knoll to Navarino. Those possibilities are: (1) the Property is sold to Navarino within six months of May 17, 2011, the effective date of the Listing Agreement; (2) the Property is sold to Navarino after continuous negotiations between Oak Knoll and Navarino; or (3) Oak Knoll accepts Navarino's offer to purchase the Property within six months of the termination of the Listing Agreement.

Scarcelli has presented evidence sufficient to overcome the prima facie quality of Harris's claim based on the undisputed facts and thus Harris must shoulder the burden to demonstrate the validity of his claim. I conclude as a matter of undisputed fact and law that he

7

cannot meet this challenge and he is not entitled to a commission by any of the above contractual avenues.

First, the parties agree that the Property was not sold within six months of May 17, 2011. The Listing Agreement unambiguously requires a sale in order for a commission to become due to Harris under this first path to a commission. I am persuaded that the references to the word "sold" in the second and third paragraphs of the Listing Agreement, as well as the requirement in the fourth paragraph that the commission becomes due at closing, require such a construction.[5] Though Harris maintains that merely producing a ready, willing, and able buyer entitled him to a commission, I disagree. The Listing Agreement specifically requires a closing and one did not occur by May 17, 2011. Furthermore, Navarino was not a ready, willing, and able buyer of the Property on terms acceptable to Oak Knoll during the initial time frame of the 2011 P&S as CHFA refused to permit the sale on terms that were agreeable to Oak Knoll and Navarino. For these reasons, no commission arose under the first possible path.

Second, the undisputed facts confirm that there were not continuous negotiations between Oak Knoll and Navarino. The parties disagree about when the negotiations related to the 2011 P&S actually ceased, but viewing the facts most favorably for Harris, they stopped by March

---

[5] "In order [to] protect AGENT should the property . . . is (sic) **sold** within six (6) months from the date hereof, to sell the property for $7,000,000.00 or any such price as the OWNER may subsequently agree upon, agree (sic) to pay AGENT the commission set forth below.

    \* \* \*

"OWNER agrees that if the property **is sold** during the term of this Agreement to a Purchaser, procured by Agent during the term of this Agreement as outlined above, OWNER will pay AGENT a commission per Schedule A attached."

    \* \* \*

"The commission shall be due and payable by certified check in full **upon the closing** of title (or lease execution).

Listing Agreement, page 1, ¶¶ 2-4 (emphasis added).

8

2013. The Property was not actually sold until July 2014. Although the parties agree that Oak Knoll and Navarino rekindled negotiations at some point, the undisputed facts indicate a significant break in communications between the two prior to the eventual closing. I find, therefore, that negotiations for the sale of the Property were not continuous, and Harris is not entitled to a commission pursuant to the second approach under the Listing Agreement.

Finally, Harris fails to meet his burden of establishing that Oak Knoll accepted an offer from Navarino to buy the Property within six months of the termination of the Listing Agreement under this clause. The Listing Agreement expired on November 17, 2011[6] but Harris could still earn a commission if Oak Knoll accepted an offer to buy or lease the Property by May 17, 2012.[7] Though Oak Knoll and Navarino entered into the 2011 P&S on October 11, 2011, that was not an acceptance of an offer to purchase the Property. Navarino's offer was contingent upon the results of its investigation of the Property during the inspection period. During that time, Navarino made a new offer to Oak Knoll on the Property. The undisputed facts show that Oak Knoll did not accept the new proposal, or any other, and Navarino was not willing to close under the terms of the 2011 P&S, by the May 2012 deadline required by the Listing Agreement. Therefore, Harris is not entitled to a commission under the third route.

Harris raises several alternative arguments in support of his entitlement to a commission under the Listing Agreement. He asserts that Oak Knoll, through the machinations of Scarcelli and Gleichman, caused the closing to be delayed to a date beyond that set forth in the Listing Agreement and therefore the loss of his commission would be inequitable. Under Connecticut

---

[6] "This Agreement shall become effective immediately and shall remain in effect six (6) months from the date hereof." Listing Agreement, page 1, ¶5.

[7] "Should negotiations continue after the six (6) months from the termination of this Agreement, should there be an acceptance of an offer to purchase/lease from the PURCHASER, OWNER agrees to pay the AGENT a commission as per this AGREEMENT." Listing Agreement, page 1, ¶3.

9

law a "seller cannot defeat a broker's right to its commission by his unilateral nonperformance of a sales contract unless the listing contract reserves the right to condition payment upon consummation of the sales contract." *Revere Real Estate, Inc. v. Cerato,* 438 A.2d at 1205. However, the failure of the 2011 P&S was not caused by Oak Knoll or its principals' unilateral nonperformance. The sale of the Property did not occur before July 2014 because, among other things, CHFA would not agree to terms that were acceptable to Oak Knoll and Navarino. CHFA, Navarino and Oak Knoll were not in accord as to what, if any, prepayment penalty would result from a sale and what CHFA terms could or would be imposed upon Navarino as a buyer. In short, there was no final agreement for the sale of the Property until 2014, and I find that Harris has not met his burden of establishing that the failure to reach such an agreement was caused by Oak Knoll's unilateral nonperformance.

     c. Equitable Claims under §105.

Harris further argues that the sale to Navarino would not have occurred but for his brokerage services over the course of four years and as such he is entitled to an allowed claim for a commission under §105. To rule otherwise, he contends, would amount to a windfall to Oak Knoll. The uncontested facts do indeed testify to Harris's diligent and consistent efforts in working to sell the Property. He and Oak Knoll had not one, but three listing agreements. Both of Oak Knoll's principals at one time supported Harris. Scarcelli originally engaged his services and Gleichman lauded his services in her April 2, 2013 affidavit. DE 26, ¶9. Post-petition, Oak Knoll's attorney reached out to Harris, asking him to negotiate with Navarino. In addition to his hard work to market the Property, this case involves a 100% payment to all creditors, with money left over to pay out to Oak Knoll's insiders. Harris's sense of unfairness in such a scenario is understandable.

10

As tempted as I am to use §105 to pay Harris, I cannot do so. That Code section provides: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." §105(a). Though its scope may appear to be broad "it should be universally recognized that the power granted to the bankruptcy courts under section 105 is not boundless and should not be employed as a panacea for all ills confronted in the bankruptcy case. As aptly put by one court, section 105 does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute a roving commission to do equity." Collier on Bankruptcy ¶ 105.01 [2] (Alan N. Resnick and Henry J. Sommer, eds., 16th ed. 2014) (citations omitted). It empowers me to invoke its authority ". . . only if, and to the extent that, the equitable remedy dispensed by the court is necessary to preserve an identifiable right conferred elsewhere in the Bankruptcy Code." *In re Jamo*, 283 F.3d 392, 403 (1st Cir. 2002). Neither Connecticut law nor the Code confers the right for Harris to receive a commission under these facts, and therefore I must deny his equitable claim under §105.

d. Administrative Claims under §503.

Finally, Harris seeks payment of the commission as an administrative expense pursuant to §503 on several grounds. Section 503(b)(2) allows payment of a broker's commission, as an administrative expense under §330. Generally, before such an expense can be incurred, the applicant is required to be employed by the bankruptcy estate with court approval, or to fall within certain narrow exceptions under §503. Here, Harris was never employed by Oak Knoll post-petition, and as a real estate broker, he does not fall within any of the other specified professions. Therefore his claim for an administrative expense is also denied.

**Conclusion**

For the reasons stated above, Harris is not entitled to an award for a real estate commission for the sale of Oak Knoll's Property and his claim is disallowed. Though nothing prevents Oak Knoll or its principals from voluntarily compensating Harris for his efforts, especially given Ms. Gleichman's acknowledgement of the value of his work and Oak Knoll's counsel's post-petition request that Harris assist with the sale of the Property to Navarino, it is beyond the scope of the Code, as applied to the facts here, for me to order them to do so. A separate order sustaining Scarcelli's objection shall enter.

Dated: February 2, 2015                     /s/ Peter G. Cary
                                            Hon. Peter G. Cary
                                            U.S. Bankruptcy Court